Good morning, Your Honors. Ramsey Abadou from the law firm of Conswick & Fodey in San Francisco, California. I'd like to reserve three minutes for rebuttal, if I could. Could you speak up, please, or put the mic up further? Certainly, Your Honor. May it please the Court. At bottom, Your Honors, when a gamble fails, that failure is not inconsistent with it having been considered, though because of the risk, a reckless gamble. That's paraphrasing Judge Posner from Teleps II in the Seventh Circuit. I think that's an important way to begin our discussion today because these cases, at the end of the day, whether you're talking about falsity or Siena, the main, most fascinating question is why. Why did somebody mislead investors? Now, the Court in this case never reached the issue of Siena or loss causation but dismissed the March 3rd statements with prejudice and the May 8th statements with leave. But that question of why is important. Why what? Why do companies and their highest-ranking officers mislead investors? And I started with the gambling analogy because the federal securities laws do not prohibit gambling. What they do prohibit, however, is failing to inform investors when a gamble a company has taken has failed. And that's precisely what happened here at Orexogen and with Orexogen. We concede, Your Honors, that the standards for alleging material misstatements in this circuit and in other circuits are robust. The PSLRA and Rule 9 demand it. Accusing someone of fraud is a serious accusation that one should take seriously. But our job here in this case was made a little easier because two high-ranking individuals with firsthand knowledge of the allegations in this case made the exact same allegation. On March 5th, 2015, Dr. Jenkins, the head of the Office of New Drugs of the FDA, characterized publicly in Forbes Defendant's March 3rd statement as misleading, unreliable, and likely false. I think he was correct. Then, on the last day of the class period, May 12th, Dr. Stephen Neeson of the Cleveland Clinic, who was charged by the FDA to oversee the LIGHT study, this heart safety study for Contrave, an obesity drug, characterized defendants' statements during a May 8th, 2015, earnings call and specifically said that investors were misled. So what defendants have characterized below in the district court and have continued to characterize here as merely upsetting Dr. Neeson and the Executive Steering Committee and upsetting the FDA, we think demonstrates the same hubris that provides the answer of why defendants lied to the market on March 3rd. But is why the issue? I thought the issue was whether or not it's legally sufficient in the allegation of the complaint. As to March 3, 2005, the 8K, as I understand it, the 8K made clear that the results were tentative. Is that right or wrong? That is incorrect. It didn't say tentative. It said preliminary. All right. Preliminary. And does the 8K then contain any statements about the statistical quality or the reliability of the figures? It certainly does. Does it say that you think it's actionable? In two respects. Can I go on a minute first? Are we working off what is in the complaint or something incorporated into the complaint in terms of exactly what was said? Well, both. We believe that. On this particular point? So it's both still. We're working off of what was part of our request for judicial notice but also what is in the complaint. And I'd like to refer, Your Honor, to a decision by this court, Miller v. Thain. Refer me to the paragraphs of the complaint we're talking about. Sure, Your Honor. That addresses the March 3rd misleading statements, Your Honor? Yes. That begins on page 35, which is the excerpts of record at, I believe, 142 and 143 and 144. And so I'd like to address Judge Payne's question about what was misleading about the March 3rd 8K. Part of it is contained in the complaint.  And it was materials that came after the briefing was done and after we had filed our motion to dismiss. Certainly, we would have gone back and used those new materials to amend had it been granted leave. But we believe the court violated the general rule, particularly in securities cases, citing eminence capital, that leave to amend should be granted. And we think that, at a minimum, there should be a remand on the court's dismissal with prejudice on my client's first try on March 3rd. I'd like to point out ER 144. And that's the chart. And this chart is very important. And I was referencing earlier Miller v. Thain because this court there held that the context and manner of presentation can mislead investors. And here, you have a 41% reduction in MACE based on what defendants claimed was a heart benefit from Contrave. And if you look at the box in this graph, it cites a 95% confidence interval, which is another way of saying that this information is statistically significant. And we know that it's not because before the class period, the company was specifically warned by the FDA and the Executive Steering Committee about the unreliability of the 25% data. And tell me again why you think it's showing it as statistically significant. There's a box, Your Honor. You'll see two lines going up. One's the placebo. The other one's Contrave. And if you go down into the box, it's got a 95% CI, which is another way of saying that they say that pertains to what they were supposed to be testing for, which is whether there were less than two times the expected MACE incidence, not whether it was a benefit. We disagree with that, Your Honor. And we think that at a minimum, that presents a factual issue. And I'll tell you what's important about that. And it's oftentimes the footprints in the snow in these cases, which is the market reaction and the market response to this graph, this deceptive graph, which was a 60% jump in the price of the company's securities in intraday trading that day. That is substantial. We've also cited, which is also important, based on this court's- Is that in the complaint? That is in the complaint. We cite all the analysts. And the leading case on that from this circuit, Your Honor, is Zoma v. Warshaw, where the court elaborates on the effect of misleading analysts. These aren't unsophisticated individuals that might not understand the nuances of a deceptive chart like this. These are sophisticated market participants who almost unanimously looked at this data, looked at this graph, and believed that there was a statistically significant heart benefit for those taking Contrave. But what we later found out and what the company found out on March 26, 2015, and I don't think that they'll dispute that, is that at the 50% level, that heart benefit vanished. Now, did the company immediately agree to issue a press release that day with Dr. Neeson informing the market that the 25% data had been nullified? No. They waited six weeks before Dr. Neeson finally forced their hand when they finally revealed that information. And they could have handled it differently. They could have not held an earnings call on May 8th where they fielded specific analyst questions from market participants hungry for information about the 50% data. Instead, they obfuscated with respect to the 50% data on May 8th. I'd like to point out another omission in the 8K that we think is material and that we think is also actionable. This is the March 3rd 8K. We know that before the class period, Orexogen had been in trouble with the FDA for violating the data access plan. They shared the 25% data with over 100 people with a financial interest in the outcome of this study. In the process of doing so, they consummated a $100 million private placement. The company undoubtedly wanted to get this 25% data out there. They believed and gambled that it would be vindicated at the 50% mark. It turned out to be wrong. There's nothing wrong with gambling when you're the CEO or the CFO of a company. But if you make a mistake and you lose that gamble, you have a responsibility to the market and to shareholders to come clean about that, and they didn't. And so we think that it's absolutely critical, Your Honors, that you correct something that the district court held that we view as a significant problem. Judge Sammartino held with respect to the 8K that nowhere did the 8K on March 3rd state that the company had the authority from the FDA to disclose that data. That's the rule. That's the bright-line rule and test that she articulated. We think that that is profoundly troubling in the context of drug cases and FDA... with FDA regulatory oversight. What the company should have said to the market, Your Honors, on March 3rd, 2015, in that 8K, is the following. We blew it with the FDA before the class period, and the FDA made us sign an agreement never to disclose this information again. There are risks associated with us doing so here, which would have enabled many investors to stay on the sidelines and not buy the company's securities starting on March 3rd. They never did so. But there's sort of a disconnect there because the reason the FDA didn't want them to disclose it was because it was endangering the study, the validity of the study, right? That's certainly part of it. The FDA was concerned not only that they were endangering the study, but that they were using the 25% data in a manner that was highly inappropriate, which was sharing it with members of the board of directors and sharing it with Wall Street. But the reason that was all inappropriate is because it was endangering the validity of the study. That's certainly a big part of it, Your Honor, yes. From the FDA's point of view, it seemed to be basically all of it. That was what they were concerned about. Okay. And so the question is, how does that hook up with whatever? And also, I gather that back in the fall, it was already public that this study was going to have to be redone. That is correct. So what exactly is the relevance to investors of the FDA's met of them, essentially? I'll tell you why. And all we need to do, and it's in the complaint, is quote Dr. Jenkins, who, as the head of the OND, the Office of New Drugs, specifically said, if you do this again, there are going to be consequences. regulatory fines, and potentially the withdrawal of Contre from the market. Right? I gather there was some caveat that the FDA then the next day corrected some of that. Again, you know, and that's part of the problem here. The complaint under 12p6 was well pled and should have been accepted as true. Judge Payne, I believe it was a case involving Wachovia, said, you know, Rule 9, and the Rule 9 doesn't require a dissertation. It requires the who, what, when, where, and why of the accusation of misleading statements or fraud. And we have done that here. And so... If you were going to amend, the district court denied your request to amend it, what would you say to add to the context or the theory of March 3, 2015, 8K? What would you possibly say that would not be a futile amendment, I think is the question that I have. That's a great question. I appreciate it, Your Honor. A couple of things. One, we discovered after the briefing that Dr. Neeson and his colleagues had published an article about this entire affair. In that article, and I believe it's Exhibit 2 to our request for judicial notice, we learned that the company had what's called on-treatment analysis. So the information that was presented in the 8K was the intention-to-treat analysis, which is different from the on-treatment analysis. The on-treatment analysis made clear that there was no heart benefit at the 25% level. In other words, they concealed the on-treatment analysis from the 8K to make it appear as though, under the intention-to-treat analysis, that the 25% data had... Time is up. Do you want to talk for two minutes about the other set of statements? Sure. And here, we allege, and this is largely based on Paragraph 127 of the complaint, which, Your Honor, mentions this on-treatment issue. Dr. Neeson explores it in this Forbes article. We think May 8th is very clear, and I'd like to correct an important misstatement. I don't accuse my colleague of doing it intentionally, but nevertheless, it's an important thing to point out. We have pointed out in our reply in a footnote, but they say that neither the May 8th 8K or 10Q ever discussed the status of the light study. That is incorrect. The 10Q on May 8th specifically says, unequivocally, that the light study was ongoing. We know that, as of May 8th, the company had known for at least six weeks. On March 26th, Dr. Neeson told them that the Executive Steering Committee had voted to halt the light study, and they said, weeks later, that it was ongoing. All right, and the judge, the district judge, I gather, relying on some incorporated or traditionally noticed document, understood that, in fact, it hadn't been terminated. And did you allege in your complaint that it was recommended to be terminated, but it wasn't terminated? So I guess my question is, are you saying, well, that was enough that that was still a misrepresentation if it was recommended to be terminated?  I think that they were specifically asked about that on the earnings call on May 8th, Your Honor. They were specifically... Recommended to be terminated, or if it was terminated? Was it being terminated? And there's interesting language, right, that defendants used that day. I believe it was defendants Klassen and Narachi. They say, if there was a decision to terminate, not if we, Erexigen, decide to terminate. It's the passive tense. It's the passive voice which makes clear that the ESC clearly had a role in making a decision about termination. I don't think anywhere in the record do defendants say or deny that they were told by Dr. Neeson on March 26th that the ESC had voted to terminate the study, whether you want to characterize it as a recommendation or not. They concealed that on May 8th. And there's no dispute that as of March 26th, they were shown the 50% data, right? And then have an earnings call six weeks later where they field specific analyst questions about those two subject matters and mislead... But what did the security... He was asked flat out about the 50% and he said, essentially, I'm not going to tell you. He says, we have seen it, right, and I'm not going to discuss it. But the question, Your Honor... So is that... Are you regarding that as a misleading omission or something that has the obligation? Why? I'm saying it's actionable, however you want to characterize it. When the CEO of a company has access to negative data that they previously touted to the market and they are asked about it, and they say, well, we've seen it, but we're not going to talk about it today, that's what compelled Dr. Neeson two business days later to issue his own press release. That all sounds very sensible, but the state of the law under this statute is pretty tough as to what your obligation is to reveal information if you haven't discussed anything about it. So the question is, maybe simply the fact that they'd already revealed the 25% data is enough to make them responsible for revealing the 50% data, but what is it that makes them responsible for revealing the 50% data? The fact that they held an earnings conference call where they fielded specific questions about that. Judge Tashima in Matrix penned the decision for the panel there where virtually the same issue arose. The 8K in that case, in Matrix, the Ninth Circuit decision, which was ultimately affirmed by the United States Supreme Court, didn't specifically mention the issue about Zycam in that case's safety and efficacy. What the 8K did was touted the sales that they were going to generate from Zycam, and nevertheless, Judge Tashima said  It doesn't have to be mere image. The question, Your Honor, is I think that the court should consider But do we have to identify what statement was made misleading by the failure to... Yes. And what statement was made misleading? We've seen the 50% data. We've seen the 50% data. And the question is, why didn't they reveal it? I'm sorry, what? The question is, why didn't they reveal it? They didn't reveal it. We know why they didn't reveal it. Because it was bad. On the other hand, their obligation is to abide by the law and not to say more than they need to say. So the question is, why did they need to say it? We think that that's enough. We think that when the company... The company could have done something very different here. It could have said, we are postponing our earnings call by a week until we sort all this out with the ESC and the FDA. Let me ask you one... Okay. Yes, Your Honor, I'm sorry. One last question, because your time is way over. It appears that the district court, you can tell me whether this is right, relied on either incorporated or traditionally noticed documents to say that in fact they didn't... the study had not been terminated. And that doesn't seem right. Okay. But what exact difference does it make to the market or to the investors whether the study was terminated? Everybody knows the study is not going... already knows that the study is not going to suffice. It's going to have to be done over. And it essentially is not reliable because of the reasons that are making it be done over. So why exactly is it so important whether they admitted that it was terminated? Because the FDA and the company and the ESC decided to go forward with the study and to finish it to completion. And this costs money. And the market and investors are reasonably concerned with questions like that, which is why they asked about the status of the light study during the May 8th earnings call. That's why they asked. Because people might believe it even if it wasn't valid. Is that what you're saying? Yeah, but there's another issue, which is, you know, Orexogen also had a business partnership with Takeda. And that relationship was very important to the commercialization of Contrave. When Dr. Neeson finally came out and revealed himself the 50% data on May 12th, the company minutes beforehand had revealed that the light study had been terminated, something they say they've been advocating all along, which begs the question, why didn't they reveal it on March 26th? Why didn't they reveal it on March 26th when they found out that the ESC had voted to terminate it if that's what they had been advocating all along? It's because they knew that there were going to be consequences associated with that on the company's share price, that the company's executives coveted. And what did Takeda do? It initiated a $200 million lawsuit against the company in connection with that study being terminated prematurely. Thank you very much. You're way over time. Thank you, Your Honor. You have two minutes. Thank you. Good morning, Your Honors. May it please the Court. Jessica Valenzuela-Santamaria from Cooley on behalf of Erextrin Therapeutics and the individual defendants. Now there's no question that there was a substantial amount of controversy around Erextrin's decisions about what to do with the interim data from the 25% interim analysis of the Light Study. And we've seen in the complaint and in the documents that the Court took judicial notice of significant criticism of the company by the clinicians who were part of the Light Study and by FDA representatives. But the question here isn't did Erextrin make the right business decision with respect to filing for a patent application and disclosing the data. The question here is does the consolidated complaint allege with particularity sufficient facts to state a claim for securities fraud? And the answer to that question is clear. It did not. And the district court got that correct. There are all these incorporated and judicially noticed documents. Do any of them matter? Your Honor, the most critical documents that the Court took judicial notice of are the documents that comprise the statements that are allegedly false and misleading. And that would be the March 3rd 8K. And we would also submit that the analyst reports that are... The WISH reports, I'm sorry. The analyst reports. There's an RBC analyst report from March 5th and a LIRINC report from March 5th. But those documents... I mean, it seemed to me that the judge went somewhat overboard in taking judicial notice and incorporating documents by... I mean, both as to what he incorporated but also by relying on the substance. I understand the part about the 8K. That certainly seems right. But everything else, why... I mean, one thing that's happened and it seems to me because of Iqbal and maybe the PRLA and not the jury statute is that we're turning these things into summary judgment proceedings. And why don't we just stick with the complaint? I understand about having to have the actual statements in context. But beyond that, why are we looking at anything else? We don't need to do that here to get the answer that the district court arrived at. Well, that's what I started with. So if you take a step back and we focus just on the statements and there's essentially two buckets. There's the statements on March 3rd where Orexogen disclosed that it had been issued a patent and that the 25% interim results supported that. There's also the May 8th statements about the status of the light study. So if we look just at the March 3rd statements and take those first, what we have are the allegations in the complaint and the 8K itself. And I would note for the court that in their opening brief, the plaintiffs concede that there's nothing false or inaccurate about the March 3rd 8K. And that's in footnote 15 of their opening brief. And that should be the end of the analysis. There was nothing false or misleading about those statements at all. What the company did was simply share with investors the data that came out of that 25% interim result. Well, it's now telling us that the little box on that chart is a claim of statistical significance, essentially. The 8K makes no statement anywhere about whether or not that data was statistically significant or not. Where was that chart? Was that in the 8K? It's in the 8K, correct. And the little box on it that says 95%, that's not a statement? It simply relays what the accurate data was at the time. And if we look at the document from... What does that little... What does it mean? It means that essentially there's a 95% likelihood that those results could not be achieved by chance. And it's simply a standard marker for what the results show. And as Your Honor pointed out previously, it has nothing to do with whether or not there's a benefit, a CV benefit. It's looking at what the null hypothesis was that was tested. Well, that's what I'm asking you, but how does one know that if you look at it? Which is, does the data rule out a doubling of... I understand that, but if some naive person looked at it, how would they know that that's what it meant? It's a... Anybody who would be versed in basic statistics would be able to see that. And I know I mentioned that you don't need to look at the analyst reports to determine what that means, but I would know... But apparently the people who wrote the reports on it didn't read it that way. They thought it was a claim of statistical significance with regard to the benefit. That's how they interpreted it, yes. But I would also note that they... So why wouldn't somebody else in an investor report interpret it that way? And those analysts also understood that the results, that the test was not finalized, that the results were preliminary and early, and that more events would be needed in order to determine what the effect was of Contrave on CV benefit. In fact, the statement did not say it was interim. It said it was preliminary. Go ahead. What the 8K says specifically, and there are multiple statements in there that make it clear to investors or anybody looking at the 8K that this was not a definitive conclusion. It says, and I quote, the effect of Contra... Tell me where you're quoting from. I'm quoting from the March 3rd 8K, which is an excerpt of Record 79. Where in the 8K? So I can follow you. Sure, let me pull that up. If you go to excerpt of Record 79, there are several statements there. One is in bold in the fourth paragraph, and it says, Importantly, the U.S. package insert for Contrave states that the effect of Contrave on CV morbidity and mortality has not been established. If you go to the next paragraph down, the last sentence there reads, A larger number of MACE are required to precisely determine the effect of Contrave on CV outcomes. If you turn a couple pages on excerpt of Record 81, there are a couple bullet points there under the chart. The first repeats the prior statement that was in bold. The second says the 25% interim analysis was prospectively designed to enable an early and preliminary assessment of safety to support regulatory approval. A larger number of MACE are required to precisely determine the effect of Contrave on CV outcomes. What are the incorporated by reference and the judicially noticed documents that you say the district court erred in considering? We don't take that position. We believe that the district court appropriately considered the documents under judicial notice. So all the statements made in there are properly considered in making the decision even though they're not in the complaint? Yes, Your Honor, and that's because the complaint quotes at length and relies on statements from a number of external sources like analyst reports and news articles, and because those are incorporated by reference into the complaint. But not for their truth, just for the fact that people said this. That's right. That's right, Your Honor. It seems like the district judge got a little lost in that, particularly with regard to the termination of the study where he seemed to rely on the statements in the incorporated documents and said that it wasn't in fact terminated, even though the complaint alleged that it was. We don't need to look at any of those. What we can look at, again, is the complaint, and there's a document, the Journal of the American Medical Association, that's the subject of plaintiff's motion for judicial notice here. We don't dispute that this court can take judicial notice of that document. So if you look at the statements in there and you look at the allegations in the complaint, the plaintiffs have not pled with particularity that the ESC actually terminated the trial as of March 26th. As opposed to recommending termination. That's correct. What's the difference in terms of an investor? Well, they voted to end it, is what they said. They voted to end it. The complaint, I think this is important to note, never actually alleges that the ESC had the authority to terminate the clinical trial. There are a number of entities here who are involved in the running of that clinical trial, including Orexogen and Takeda, that at that point was the trial sponsor. You also have the Executive Steering Committee and you have the FDA. There are a number of entities who are, as the company correctly said on May 8th, basically, this is in flux. We are in active discussions about the fate of the light study. That's the problem. I mean, the real problem is it wasn't in flux. I mean, they hadn't yet officially declared it ended, but it was dead. It wasn't, I mean, it appeared that they were dragging out the declaration for their own purposes, but there was just no chance it was going forward. Was there at that point? At that point? In other words, you're kind of hanging on technicalities. No one had signed off on the document saying, this is, we're killing it, but everybody knew it was dead. I think the important thing there is, what's the question in terms of whether the complaint alleges securities fraud? You look at whether there was an omission that made a statement that was otherwise made misleading. And, Your Honor, I think to a certain degree that's correct. Everybody knew that this study was essentially dead, including investors. They knew at that point that Erexogen was advocating for its termination. How did they know that? Because that was included in the May 8th statement where... In which statement? I'm sorry. Yeah. I mean, I just don't know. I need to know. If you look at paragraph 110 of the complaint, which is excerpt of record 154 and 155, Mr. Naraki tells investors that Erexogen had been advocating to terminate the trial early. Investors also knew at this point, and they knew back in September of 2014 when the drug was approved by the FDA, that the light study didn't matter anymore. It was not going to qualify to satisfy the company's post-marketing requirement. That was done. A new cardiovascular outcomes trial would be necessary. So at this point, investors knew the light study was ongoing. It was on the side. Erexogen had been advocating for it to be terminated. There were ongoing active discussions about its fate. If it was going to be terminated early, at that point the company might consider disclosing the results. And they knew that a new trial at that point had already been underway and was the one that... But they also did not know that the ESC had voted to terminate it. Is that correct? As of May 8th, that information had not yet been disclosed. That's correct. So that is what he says is necessary to make all of those other statements accurate in view of what they actually had said. Isn't that right? Well, at that point, the investors knew that the status was in flux. No, it isn't. It's his theory. That it is the failure to have disclosed that the ESC had voted to terminate the study, which should have been added to make understandable and accurate all of the other statements you just pointed to. I don't agree with that, Your Honor, because investors knew that Erexogen had been advocating for its termination. And it doesn't make sense. It's not plausible that the company would be trying to mislead investors if what it ultimately wanted was to terminate the study itself. It simply doesn't make sense. Yeah, I understand your point is that. But to get there, you have to first accept the premise that his argument is that the single thing that made that statement inaccurate was the failure to disclose that the vote had been made to terminate it, right? Investors knew at that point that there were ongoing active discussions about whether to terminate the study. But if they're advocating it, they say, which we have been advocating, okay? So if in fact they're advocating it, then it must be somebody else who was in the way. And in fact, there is no somebody else in the way because the committee had already voted to terminate it. So why isn't it terminated? In other words, the implication of this is somebody else is not taking our recommendation to terminate it. Perhaps that or that there are other considerations that need to be taken into account, like communicating with the trial sites, making sure that patients are at a point in their treatment where the clinical trial can be stopped. It's an incredibly... Excuse me, but is there anything in the record that tells us what is the consequence of what happens after the ESC says vote to terminate it? In other words, is there an appeal from that? Or is that the final word? The recommendation to terminate is in effect the final word. The complaint doesn't allege that the ESC had the authority to terminate at all. There aren't allegations in the complaint about what happened in that interim period other than the company was in active, ongoing discussions. And there are some allegations about draft press releases around an announcement about the termination. But in terms of what happened between March 26th and May 12th when the termination was actually disclosed, we know there were ongoing, active discussions. Your theory is that the absence of... that it's not plausible to believe that the fact of the ESC vote would have changed the minds of investors. That's correct. Actually, the complaint does allege that the study had been halted. It says, Defendant Narachi, who had been informed weeks earlier by Dr. Nissen that the light study had been halted, misleadingly responded that, I think that would be something we need to disclose. So it does allege that it was over, terminated already. It doesn't disclose that ESC had the authority to terminate it. It doesn't matter who did. The allegation is that it was terminated, had been terminated. It also alleges elsewhere in the complaint, and I'll point you to Paragraph 127, which is on excerpt of Record 165, that the ESC voted unanimously to recommend that the trial be stopped. And if you look... However it happened, the allegation in the complaint is that it was terminated, finished, done. Not happening. If you look at the Journal of American Medical Association... But that's what we can't do, you see, for the truth of something. The complaint is stating that it was done. Why isn't that the end of the matter? It's inconsistent. The allegations in the complaint are inconsistent on that point. How are they inconsistent? The fact that somebody recommended it is not inconsistent with the fact that it then happened? It is inconsistent when there are no allegations that that was the entity that actually had the authority to terminate the study in the first place. It doesn't matter who had the authority. The allegation is that it was done, it was finished, it wasn't happening. The May 12th press release, if you look at the language there, says that Takeda and Orexogen accepted the recommendation of the ESC for early termination as of May 12th. That's what it says, but the allegation in the complaint was that, in fact, the decision had been made earlier. The allegations in the complaint are inconsistent, Your Honor. Tell me how they're inconsistent. Because the complaint elsewhere alleges that it was only a recommendation, that the ESC voted to recommend termination. Okay, if somebody recommends something on May 26th and on May 12th you say it happened, somewhere in the middle what they recommended happened. Regardless, even if you were to accept the premise that the complaint adequately alleges that the trial had been terminated, it's not material to investors at that point because the Light Study was not something that was needed as a regulatory requirement. It was no longer going to satisfy the post-marketing requirement that the FDA had imposed on Contrave, and investors knew that the status at that point was in flux. Isn't all of that really something that is to be dealt with at summary judgment as opposed to resolving it at a complaint so you have a full record and can make those conclusions and say the district court can then with confidence say and adopt your theory of the case? No, Your Honor. We believe that the court can decide that issue as a matter of law. The district court didn't decide that it wasn't material, did they? No, they decided that there was no false statement. That's correct. So should we be deciding... I understand we could. Should we be deciding a materiality issue now? Well, the court could also remand to the district court for briefing and consideration of that issue and others because, of course, while we briefed the issue of Scienter at the lower court, that was not something that the court decided and was not something that had been briefed here on appeal. Well, you're of your time, too. Thank you very much. Thank you. I'll give you two minutes. This time it's really two minutes. I'll be short, Your Honor, I promise. I'd like to deal with this morbidity mortality issue that defendants have talked about again and again as a warning in the March 3rd 8K. They have in bold print, you know, doesn't establish morbidity or mortality. That's not the issue with the 8K. The issue with 8K is did Erexogen mislead investors by claiming that Contrave provided a heart benefit? The question isn't whether it killed people or harmed people. The question is did it mislead investors by giving them the false impression that it was statistically significant and that it provided a heart benefit. So you're relying for the statistically significant in that little box. Well, no, there's more in the complaint about that, Your Honor, but that's certainly critical and that's a statement and a great citation there is Miller v. Thain where the context and presentation, the context and manner of presentation is absolutely important. If you bury something, you know, in a 1,000-page document, this court has said we're going to take a look at that. Well, what else besides the box are you relying on for a claim of statistical significance? Well, we have... They said it was preliminary. They didn't say it very much, but they said it's preliminary and we need... and to have a final result, we need more. There was an analyst report by Learling that we referenced in the complaint where the analyst had met with management and the headline of his analyst report was this is statistically significant. And Zelma v. Warshaw, which we cite in our papers... Some analyst gets it wrong. This court has specifically held that if management goes to an analyst to accomplish for them what they're unwilling to do directly, that ruse is not going to fly in this circuit. No, but he could have just misunderstood what was said. He could have. And if we get to discovery, we'll sit down and take some of these deputies... In order to make that fly on at the pleading stage, you have to allege an intentionality element. Did you? I don't remember. I think we did. I didn't remember seeing it, but it's a long complaint. But let me just make two more quick points, which is... and this is on page 34. Actually, you actually are out of time. Okay, thank you, Your Honor. Thank you very much. I appreciate it. Thank you both for your arguments in Koja v. Horace in therapeutics. And we'll go to the last case of the day, Stevens v. Corologic. Thank you.
judges: Tashima, Berzon, Payne